Good morning, Your Honors. Tracy Amblom for Appellants Aguayos and I'd like to reserve five minutes for any rebuttal argument. Your Honors, we're here today on APA review of the Assistant Secretary's decision in 2013 and that review is de novo review. My clients are federally enrolled tribal members and as such the department had an absolute duty to take certain actions in this case. My client's injuries occurred because the department did not act in good faith in this case and within the scope of their authority when my clients first appealed. Had the department acted in good faith, we would not be here today. I've asked the court to take judicial notice of several documents that we discovered after briefing that are internal records of the agency. There's four decisions by the Department of Interior that states that the band is operating under its Articles of Association and there's So let me just ask you that. First of all, I just want to say, I mean, from a personal perspective, it's very sad to me the situation that you're dealing with here. But we're dealing with the matter of law here and the first one that comes to mind to me is the fact that your challenge is one of the merits of whether the 1999 Constitution was properly ratified. Is that correct? That's correct. And yet we've got a statute limitation, 28 U.S.C. 2401, that sets a six-year time limit. That's correct, Your Honor. Why isn't this case barred by that statute? Because the Glenn Rivers case says that the statute of limitations doesn't begin to run until the injury is incurred. And my clients would not have even known about the injury. This enrollment ordinance is a void enrollment ordinance and it was void ab initio because this Constitution was never ratified. So they didn't have any power to enact this ordinance. When did your clients become aware of this? When they were disenrolled or attempted to be disenrolled. They're still federally enrolled tribal members. I understand. So they became they discovered this information actually back in June 2011 when the first eight, they were attempting to disenroll them. So your position is that that statute of limitations is told? It doesn't run until they have actual injury. What case do you rely upon? Glenn River. It's a Ninth Circuit case. And you think that applies here? Yes, it does, sir. And the Glenn River case says, let's get to the statute of limitations. Then we cite it in our briefs and in our reply briefs. The Glenn River case states that the statute of limitations begins to run when an agency applies a rule in a manner exceeding constitutional authority. That was when they recognized that void enrollment ordinance. That's when that injury occurred. In fact, my clients would not even have been able to challenge that Constitution until they suffered an injury in fact because they wouldn't have had standing, even if they'd known about it. They had to suffer. They were tribal members though, right? They were tribal members. And they were part of the council or whatever. They were part of the group that would have voted on it, right? On the Constitution? Yes. The Constitution was not voted on. Well, that's what I mean. In your theory, as I understood it, they should have been able to ‑‑ every member of the tribe should have been able to vote on it, and therefore it was invalid. That's right. Right? Yes. So why wouldn't they have been harmed when they purported to go ahead with the new Constitution? Because they never voted on it. They didn't know that it's in existence. So nobody knew that it was in existence? That's right. Nobody other than the tribal ‑‑ The executive committee. The executive committee and the group that voted on it? Yes. Nobody else knew about it? Nobody knew about it. They didn't know that ‑‑ there's a declaration in there from Elsie Lucero, who's the BIA's own employee that's in the record, that states that she had worked there and she was in charge of membership for the last something like 25 years, and she said that that Constitution was never ratified and that the Articles of Association controlled, and that's in the record. So nobody knew about it, and that's the BIA's own employee. And she worked there until 2005 with the BIA. Tana, explain to me why ‑‑ so we're on APA review, right? Yes, we are. So their decision has to be arbitrary and capricious. That's correct. And if there's an error of law, it would be arbitrary and capricious. So is your argument here that there was some ‑‑ that the agency misapplied the law or made erroneous legal determinations, or is it that if you take a look at the entire record, that their decision is just arbitrary? Well, you have to ‑‑ What's your argument? You have to take a look at the entire record, first of all, Your Honor, because you can't just cherry pick the decision. You've got to be able to look at the conflicting evidence as well, and the Assistant Secretary never explained away Elsie Lucero's declaration. That's the BIA employee that said that Constitution was never ratified. Well, they don't have to address every piece of evidence that's presented to them. That's a critical piece of evidence right there that's saying that this Constitution was never ratified. And then there was also meeting minutes in the record, Your Honor, that showed that they were trying to adopt ‑‑ they were trying to amend the Articles of Association and adopt this new Constitution at the same time. So those two pieces of evidence were in the record, and there was also another critical piece of evidence in the record that the Assistant Secretary didn't address, and that was the band's own website that admitted that the band was operating under the Articles of Association. So we've got three pieces of critical evidence that the Assistant Secretary ignored completely that support the position that this Constitution was never ratified and was never adopted. Do you agree that under the Indian Reorganization Act that the tribe was entitled to adopt its Constitution and bylaws subject to the approval of the Secretary of the Interior? They never got secretarial approval, Your Honor. I didn't ask you that. Yes. Do you agree that that's what that law provides? Yes, I do. Okay. So your perspective is that what the agency did, at least the other side claims, that the agency did approve it. If they did approve it, do you agree that that creates a problem for you? They didn't legally approve it because they needed a secretary. You're interpreting what the Constitution of the tribe required, right? You're saying that there wasn't a requisite vote. I'm also saying, Your Honor, that under 476 they had to have secretarial approval. That is not secretarial approval. When they issued that retroactive document that was in 2000 that dates back to 1997, that was not secretarial approval. You're saying that even though the Secretary said then that it approved, admittedly retroactively, what they had done, you're saying that's invalid? It didn't go to the Secretary. It only went to regional. Does it have to go to the Secretary herself? Yes, it does. And what authority do you rely upon? 476. And I cited a case in my brief. It has to go to the Secretary for approval. Let me get to the... Because under 476 it's got to... Let's get in here. Yeah, it's in the reply brief on page 6. And it's California Valley Miwok Tribe, 515 Federal 3rd, 1262, 1264. There's two ways to... It's got to have secretarial approval, and we don't have that in this case. So that's another piece of evidence that the ban never ratified this document. You're quoting 476, the statute. You're saying that your interpretation is that the Secretary, him or herself, must personally ratify it, not the head of the Bureau of Indian Affairs or anything like that. That's at Sacramento level. It's got to go up to Washington, D.C., yes. Because you're talking about a whole new governing document. It needs to have the ban as a whole approval. You can't force a document on these tribal members that are by a minority of tribal members. You have to be able to put it out for election and allow all the adult voting members to vote on this Constitution. Let me ask you this. Let's just say, arguendo, that the Secretary had approved this Constitution based on what happened. Would that be acceptable? Not in terms of the result, but would that have satisfied the law? Well, then I think the Constitution would have been no. They still needed an election on this. The tribal members never got to vote on this Constitution. They never got to see it. Just listen to me, please. My question is this. If the Secretary of the Interior had personally approved this, then don't you have a situation where, under the law, the tribe is entitled to interpret its own laws and its own documents? Do you agree with that? That is true, that they do have the interpretation. If that's the case, and the tribe, through its Executive Council, says the election that we held complies with our law, what's the Secretary and the agency to do in that situation? Again, assuming, arguendo, that the Secretary had personally approved the Constitution. Well, there's an injury in fact now, and so the federal government has a duty to recognize what was the legally approved document. And to look at the legally approved document, they have to look at their own records, and they have to look at the process that it's going through. And they have to ensure that that document that they're saying that the ban says is my legal document is the legal document. Okay, well, forgive me, Counsel. Either I didn't explain it correctly or you're not understanding me. What I'm saying is if the Constitution was legally approved, and I think you agreed that under the document and under federal law, the tribe is entitled to interpret its own legal documents. If that's true, then what role, once the Secretary had approved it, would the government have in making a determination of whether there had been a proper election? They have to ensure that because their role is to ensure the political integrity of the ban. Okay, but again, follow me on this. If the tribe has the right to make and interpret its own Constitution. It has to follow tribal law, Your Honor. Okay, so you're saying that the tribe messed up. Right. Isn't then the appeal with the tribe? No, it's not with the tribe. The appeal is not with the tribe because the appeal goes to the BIA. The BIA has to ensure that that tribal document was validly passed, and that's the cornerstone of their trust responsibility. They have to assure that that was validly passed. The tribal members never got to look at the document, vote on the document, and now they want to enforce a document that's been approved at a general council meeting. You're going away from my general hypothetical. You're just saying, let's put that aside. I'm telling you that it didn't get validly passed, and you keep coming back to that. And I understand why you're doing that. We have to interpret the law based upon the case law and on the statutes. And what troubles me, I'm sorry to say, is that my understanding of the code and the regulations is that when the department and the agency has approved the Constitution, that then the tribe gets to interpret its own laws, that it interpreted what happened as being sufficient. And if that were correct, just for discussion purposes, then your claim would be within the tribe. You're saying, I gather, that notwithstanding its ability to interpret its own law, there is an overseen, overarching role for the government to play to countermand and deny the tribe the ability to interpret its own documents. Is that right? Yes. And I can quote again. This is from the California Valley Miwok case, and it says, the cornerstone of the trust obligation is to promote a tribe's political integrity, which includes ensuring that the will of the tribal members is not thwarted by rogue leaders when it comes to decisions affecting federal benefits. And that case also involved, I think it was adopting a Constitution in that case. And there's other cases that we cited where the overall authority, I think it's Babbitt, I cited in the opening brief, but it was a Babbitt case where they have to ensure that those elections, because they're enforcing a governing document that's legitimately adopted by the band as a whole. So the executive committee, for instance, could say, okay, we're going to pass this Constitution and look like it's passed, but to enforce that Constitution against any of the tribal members, the federal government has a duty to ensure that that Constitution is being passed by the whole body, by the whole tribal body, with adult voting tribal members. And let me just see if I can. That has to be done by the secretary rather than his delegating that to a local. Right. And what's the case for that? That's California Valley Miwok case, which says that it's under 476. It says that there's two ways to approve constitutions, because we're talking about a whole new governing document. As Elsie Lucero said, this took away from the Articles of Association and gave all this power to the six-member committee. So when you're adopting a whole new governing document, you have to go through a 476 process, and that doesn't mean that the tribe cannot adopt its own constitution. It means it needs to have secretarial approval, and there's a review process for these constitutions to go up, and they have to go up the chain of command. So they start with the agency, and they move up to regional, and then they get to Washington, D.C., and that is the way these constitutions get passed. Do you read Miwok to say that that's required? What pin site? Well, I think it's ‑‑ I don't have it here, but I'll give you the site for it in just a second. While you're doing that, I'm going to just read you something from the Miwok case. I'd be interested in your response. This is at 1266. Notwithstanding any other provision of this act, each Indian tribe shall retain inherent sovereign power to adopt governing documents under procedures other than those specified in this section referring to 476. If tribes follow this option, it is not guaranteed approval by the secretary, but the secretary may approve it. In previous cases, the agency has taken and courts have affirmed the position that it has discretion to not approve a constitution that does not reflect the involvement of the whole tribal community. Right. So bottom line is it's discretionary on the part of the secretary and the agency. They can approve it, but they don't have to approve it. Well, it would violate their trust duty, Your Honor, to enforce a ‑‑ and I think Morris v. Watts is another case that says that to enforce a tribal document that has not been adopted by the band as a whole, that's ‑‑ they can't do that. Could you just clarify one thing for me? Under the articles before they adopted the constitution, who were the voting members of the tribe? The general tribal council. Does every enrolled member of the tribe, were they a member of the tribal council? Okay, yes. No, I want to know. Under the articles, did it define as a member of the council every adult member? Who made up the voting body? It was the adult members of the tribe that used to be able to vote on everything. Under the articles? Yes. Right. So when they adopted the constitution and they had their resolution, they say that the Pala general council in the general election. No, it was a general council meeting, Your Honor, where there was only ‑‑ I'm just trying to understand what's the difference between a general ‑‑ I thought a general council consisted of all the voting members of the tribe. You have to look at the governing documents. In both those documents, whether it's the articles of the association or this constitution that we're talking about, they set out the differences between meetings and elections. Elections, as Elsie Lucero, the BIA's employee said, is they're validated. They have to give them notice. It goes out to everybody. These general council meetings, a meeting is not an election. You can't vote at a meeting. Maybe 20 people will show up at a meeting or 40 people will show up at a meeting. Election has a whole different meaning. It says in the general election of the tribe voted to revise the Pala tribal articles and association into the Pala tribal constitution. That's right. The words meetings and elections are two different things, though. So we shouldn't ‑‑ the secretary shouldn't have taken it in this way. That's correct because it's a ‑‑ They should have dug down deeper and said, well, did you really have an election or did you just have a meeting? Well, the secretary had the meeting minutes there, and the meeting minutes are in front of the ‑‑ were in front of the secretary. The meeting minutes were, like, at the excerpts of record 198 or around there. He had the meeting minutes that show what they were doing. He said there was a quorum and that the constitution was approved, right? This was a general council meeting, Your Honor. Oh, I understand that, but I'm just saying what the record shows. It was advertised, as my colleague says, indicating that there would be a vote on the constitution. No. The quorum there, according to the record, and no evidence to the contrary, and that it was approved by a majority. Well, actually not, Your Honor. The meeting before the meeting, which was held on November 12th, which the meeting before the meeting said that we're going to ‑‑ What was the meeting before the meeting? It was the November 12th meeting minutes in the record, and that meeting said that we're going to vote on the articles of association. That's all it said. And then seven days later, what they had was this meeting, and they said, well, the general council has been working on this constitution for the last couple of years, and we think that this could work for the ban. That's all that says. And so we're going to go ahead and we're going to vote to put the constitution in rather than the articles of association that they've been working on too. And was that advertised to the members of the tribe? Not the constitution, just the articles of association. It's saying that there was going to be a vote on the constitution. No. There was not. No. Are you sure? Yes. Okay. It's in the record. It's in the meeting minutes. So the certification that's attached to this resolution 97.36 isn't worth the paper it's written on? Well, all it's saying is that they passed this ‑‑ well, what it says and what Elsie Lucero's declaration says and what King Freeman's declaration says, he was part and he voted on that resolution. And what they say is all that was was a vote to start the constitution process to have the BIA approve it. It wasn't a vote by the vote of the band as a whole. It was not an election. All it was was to send it up for approval. Okay. I think you're over already. Okay. Thank you. Thank you. We'll give you time for rebuttal. Okay. Thank you. Thank you. Good morning, Your Honors. May it please the Court. John Smeltzer for the Department of the Interior. Your Honors, let me start by just saying that I am not here to defend the disenrollment decision that was made by the Palabans Executive Committee. The BIA recommended against that disenrollment and that remains the Department's position on the merits. But as this Court has recognized and as the Supreme Court has recognized, the ability to determine tribal membership is fundamental to tribal sovereignty and to tribal self‑determination and is generally reserved to tribes under federal law. Congress has not specifically provided for the courts or for the BIA to review tribal membership decisions. And for that reason, the Secretary, the Assistant Secretary here, determined not to get involved in the essentially internal tribal dispute. And we submit that should be affirmed for two separate reasons. First, because any authority that the Assistant Secretary had to intervene in this dispute comes from the general authority of the BIA to manage tribal affairs. And any time an agency decides not to act according to generic enforcement authority, that's considered unreviewable under the APA Section 701A2. Counsel, your opposition indicates that the decision by the agency to approve the Constitution as allegedly ratified by the tribe must be made by the Secretary of the Interior personally. Is that correct? That is not correct. What does the law say about that issue? Let me back up and address the 476 of the Indian Reorganization Act and how it applies to approvals. The 476A addresses, let me see if I have the, 476A specifically says, any Indian tribe shall have the right to organize for its common welfare and may adopt an appropriate constitution and bylaws. And any amendments thereto will become effective upon secretarial approval. So that sets out what the California Miwok case says is a safe harbor for tribes that choose to follow the secretarial procedure. And then there are regulations, there are federal regulations adopted by Interior that govern those types of elections. And they set out which officials may approve the Constitution in those circumstances. So basically when the term Secretary is used here, as is so frequently the case in federal agency law, there are regulations within the department that delegate to other people to act on behalf of the Secretary. I suppose on the theory that the Secretary would never go home if he or she were constantly having to approve everything that the Department of the Interior approves. Is that right? That's correct, Justice, but that provision didn't even apply in this case because of Section 476H, which I believe you cited or quoted from in the California Miwok decision, is where the statute says that the fact that we provided an approval mechanism does not mean that tribes cannot do their own thing and follow some other procedures for adopting. If they went through the approval mechanism, where would it end? Could the person who approved this Constitution or whatever it is she did, would that constitute approval under the statute? Well, there's a third concern here, Your Honors, and that is both 476A and 476H apply to IRA tribes. There's an opt-out provision in the Indian Reorganization Act that allows tribes to vote against the application of this particular statute to those tribes. This tribe voted against the IRA, so none of these provisions even apply to this tribe, and that's part of the complexity of this case. The BIA has an obligation to conduct government-to-government relations with this tribe, but these specific procedures that are set out in the Indian Reorganization Act and in the regulations governing the Indian Reorganization Act do not apply to that approval process. So basically, once Congress passed the IRA, the agency really had no ability to veto what the tribe adopted, is that correct? Well, I wouldn't put it in that stark terms either, Your Honor. The department has to ensure that the government, in conducting government-to-government relations, that the government of the tribe is a legitimate government of the tribe. And so it has authority pursuant to 25 U.S.C. Section 2, the general statute that empowers BIA and the assistant secretary to act in areas of Indian affairs to determine, you know, is this a legitimate government of this tribe? What's the citation you gave me again, please? Section 2 of 25 U.S. Code, that is the applicable statute here, and it's a very broad statute, and all it says is that the commissioner of Indian affairs, who is now the assistant secretary, shall have the authority to manage tribal affairs or the management of tribal affairs. And that's what we're talking about is this broad authority. I don't know quite where you're saying that leaves us. If supposedly there was an illegitimate constitution in this tribe, what authority would the secretary or the assistant secretary have, and would it be mandatory or discretionary? Well, it's a broad discretionary authority to make these determinations. Let's say two members of the tribe held a meeting among themselves and said here's your new constitution, this is it. Well, that was sort of the facts of the California Miwok case. That was a situation where a minority of the tribe had asserted that it was the governing body of the tribe, and in that circumstance the department clearly has the authority to say, no, you know, you're a minority, you don't represent this tribe, and I believe the California Miwok case was a circumstance where that minority had brought an action against the department and said, look, you have to recognize this because, you know, we did this constitution. And what that court said, the D.C. Circuit said is, look, the department doesn't have to acknowledge a tribe in that circumstance. But what this points to is that the broad or the authority that the assistant secretary has under Section 2 is authority that the assistant secretary has generally exercised only in these contexts where there are circumstances where the government of a recognized tribe cannot be identified. There's a rift in the tribe, there's a crisis of government, and in order to conduct government-to-government relations, the assistant secretary, BIA, has to determine, you know, who are they going to deal with. And in those circumstances, they have authority to say, no, we won't accept your representation, that you represent the tribe. That did not happen in this case. That's not this case. This is a case of a membership dispute, a dispute over who can determine who is legitimately a member of the tribe. And it arose on where the tribe had applied a 2009 ordinance, and the complaint is purely under tribal law by the plaintiffs, that the tribal officials here did not act in accordance with their governing documents and didn't apply their ordinance properly. And we submit in our brief that this is very much like the Lewis case, where this court held that, look, there's no cause of action directly against the tribal officials, and there's also no cause of action to compel department officials to enforce the tribal law. And that ties into our argument that there is no governing standard, there's no obligation under federal law for the federal government to get involved in these sorts of disputes. Now, the federal government did get involved with respect to this tribe early in its organization and did approve their constitution and did, as part of an early enrollment ordinance, accept a role in determining membership issues. It approved the constitution under what authority? When it approved the constitution in 2000, it said it didn't have to, right? No, I understand that. But it did approve it under section two. Right. Just the general authority to conduct government affairs. And so once it approved it, and I gather it's your position that the secretary, in this case her, did not have to do it personally. It was the assistant secretary or that person's agent, right? It was done by the regional director, I believe. Is that sufficient under the case law or the regulations? And there's no particular regulations that govern this particular approval process because it's not an IRA tribe, it's not under the regulations they have for approval. And in the record, the discussion from the federal officials was, do we even have to approve this? Now, part of the history with this tribe was they had an articles of association that said an amendment needs BIA approval because initially BIA approved the articles of association. So the BIA said, look, we've got a history with this tribe. We've said we need to approve amendments, so we're going to look at this for approval. When you say we're going to look at this, what does that mean? Well, the record shows that in the period when they were reviewing it for approval, they looked at it to ensure that the substance of the document was not contrary to federal law. They made recommendations about, you know, certain – and they also made – they didn't say you must. They made some recommendations about changes that could be made. Did they make approval conditioned on acceptance of any of those? No. Well, let me step back and give you the process. In 1994, there was a tribal election on a constitution. After that tribal election, then it was submitted to the BIA. The BIA made some suggested recommendations. There were some changes made, and then there was the 1997 general council vote where they approved it. And that approval was on the change document, some slight changes. And then they provided that to the BIA again, and the BIA said, well, there's still some other things we might recommend you can do. The tribe at that point said, look, we're not making any further changes. We want you to approve it. And then BIA took their final look, and they determined that it didn't contradict federal law. So they approved it retroactive to 1997, the date of the council resolution. If the department's approval was set aside, what would then happen? Well, this case really isn't. The complaint wasn't directed at the 2000 approval. It was directed at the 2013 decision that was issued by the assistant secretary, where the assistant secretary essentially explained, provided a statement of reasons for why the regional director was correct in not getting involved in an enforcement of an internal tribal affair. So our fundamental point is, look, the 2013 decision was just a statement of reasons for not acting, pursuant to general authority, enforcement authority that might exist, for example, if there were a constitutional crisis or some problem with figuring out the government of this tribe. And that's not something that this court can review because there's no standards in federal law that governs that. And so that's the fundamental problem. They didn't bring an action against, with respect to the approval of the Constitution. Who would have had standing to challenge that determination? Any member of the tribe? Presumably anybody that would be impacted by it, you know, if there had been a, you know, back in 2000, after that approval decision had been made, yeah. And that's where the statute of limitations issue that I mentioned earlier perhaps comes in, right? Yes, although, as I said, Your Honor, and I don't want to speak against interest, but they didn't challenge that. And what they did is they asked the assistant secretary to reconsider an approval that had been given. And the assistant secretary didn't have to reconsider it, even if it was in the statute of limitations, right? Because it's a question of when does an agency have to reconsider an approval that the agency had already done. The question I had asked, suppose the approval was set aside and the approval wasn't mandatory, as I understand your position, they didn't have to approve it or disapprove it. Well, back in 2000, again, the original Articles of Association said they could not be amended without BIA approval. So, you know, if there were a set aside of an approval of that constitution, I think that would at least raise some issues about does the tribe have a governing document. Could it just revert back to the articles? I suppose, Your Honor. That would be the governing document still in effect. Yes. Because the amendment had been rejected or set aside or the adoption of the constitution had been set aside. Right. But, yes. But, you know, if the court determines that it has the authority to sort of look at the constitutional ratification process and whether it was sufficient, we do think that the reasons that the assistant secretary gave for not revisiting that approval were perfectly appropriate. And the one relating to the statute of limitations was, look, this is too late to come in and try to redo a document that the tribe has been operating under since 2000. Again, in 2000, the regional director approved it retroactively in 1997, which was a signal to the band that, you know, you can go forward and operate under this constitution. In 2003, as we stated in our brief, the band voted in referendum elections to amend this constitution in a variety of ways. And, you know, those votes certainly would seem to cure any concern about whether there was legitimacy to the original constitution because you can't amend the constitution, obviously, unless you accept the foundation document. But they also certainly put the plaintiffs on notice that the band was operating under this constitution. And, of course, the decisions in this case were made under the constitution. They were made under the 2009 ordinance. The provisions, the terms of that ordinance were specifically cited by the executive committee. So the executive committee clearly was operating here and in other actions under the 2000 constitution. Let me just clarify. Just I want to make sure I understand the government. What is up for our review here? What is your understanding that they're asking us to review? Our understanding is they're asking you to review the decision not to take enforcement authority. And our position is... On the membership issue. They're coming and they're saying, look, the band's executive committee violated tribal law in a couple of ways in taking this disenrollment action. And we want you, BIA, to say, no, band, you can't do that. You violated your law. We won't accept that. And what we're saying is... BIA says we're staying out of this fight. That's right. And they would have intervened under Section 2 had they done something, right? Well, any authority to intervene would have been under Section 2. Because this is a non-IRA tribe. Right. And your position is that's a very discretionary determination? Yes. I mean, again, the case law in terms of authority to review a decision not to act is that there is no... It's a case where it's committed to agency discretion. What's the best case that supports that principle? Well, we cited it in our briefs. Heckler v. Cheney is the Supreme Court case. There was a Ninth Circuit case we cited in the brief as well. Those cases are not in the context of Indian affairs and Section 2 necessarily. But we believe that this particular request for this type of enforcement action fits within that rubric. When does the government believe that the statute of limitations, the general one for six years, began to run in this case? Properly, it would be if it's an action, an APA action, against the department officials for the approval, it would be as soon as anyone had constructed notice of the decision, the 2000 decision. The 2000? Well, the record isn't fully developed on when somebody first knew. But what the assistant secretary pointed to was that at least by 2003, when the amendments to the Constitution were voted on in referendum election, that members of the tribe would have been on notice at that point. They would have gotten us to 2000 in about 9 or 10. Right. Again, if there had been. But the complaint in this case was not a complaint against the BIA's approval action. I mean, what the plaintiffs essentially said was the BIA's approval was just a precursor to then the tribe then putting it out for ratification. They're saying, well, what the tribe, under the tribal law, what the tribe did was, okay, we got approval and now we're going to put it to a vote. And so they're not really necessarily even challenging that substantive review. They're just saying something additional had to happen under tribal law in order to give this effect. There had to be a further referendum election. And we submit that's not how the tribe interpreted it or the tribe's elected officials because we're here, right, because the tribe operated under the 1997 Constitution and the 2009 ordinance in making this enrollment decision. Okay. Unless the Court has other questions. Thank you, Your Honor. Okay. Well, for one thing, we did ask to rescind the approval. We asked in the agency appeal. It's in the record. It's at ER 175. So we asked the Court to rescind it. And as to the secretarial approval, when you were asking him a question up here, under the Articles of Association, the original governing document, it requires secretarial approval. So they could not just have this whole new governing document without secretarial approval because under the original governing document, it requires secretarial approval. And what he's talking about, about discretionary, I think if you go back and look at that Miwok case, the Court of Appeal is saying there's no safe harbor here. When the Department of Interior approves or even, you know, when there's a constitution that comes, that has to be adopted by the band as a whole, by all the adult voting members, because you can't just shove a constitution on by a minority vote on the whole tribe. It's got to go to all the adult voting members. I think if you look at Elsie Lucero's declaration, she's stating that this never went, and she was very familiar with all the voting that went on, and she was the BIA's own employee. She stated that it never went out for the whole band to vote on. Let me just ask you this, Counselor. I'm looking at your complaint right now, and your prayer is after hearing Grant's declaratory relief in plaintiff's favor and set aside the ASIA June 12, 2013 decision, which was the de-membering decision, right? No, this was the assistant secretary's decision that found that constitution was legitimately adopted. That was 2000, was it not? No, that was 2013. This is when the assistant secretary took jurisdiction over this case, and he made certain rulings in this case in 2013. The assistant secretary said at that time— What happened in 2000? In 2000, there was this retroactive approval that nobody really knew about. Okay, so you're saying because nobody knew about that, and I assume you're also saying nobody knew about the 2003 amendment either, right? That's correct. What they used to do was they used to use the word constitution and articles of association interchangeably. I think if you look, there's meeting minutes that show what we're saying, that at the same time they were adopting the articles of association, they were also working on this constitution, but they were still governed by the articles of association. It wasn't until 1997 they put this completely new document in that got retroactive approval by some regional employee. In 2000? That's correct, in 2000. Did they know about it? Could they have challenged that? Not until they suffered an injury in fact. They didn't suffer an injury in fact until it was imposed on him, this new constitution. As members of the tribe at that point, the fact that a constitution was allegedly ratified would not have given them standing to sue? Until they had an injury in fact, that's right. Okay, but you're saying the fact that the constitution was allegedly adopted illegally and improperly, you think that as members of the tribe at that point they had no standing? Well, had they known about it. So you're getting back to whether they knew it. Yeah. But had they known at that point, they clearly would have had standing, would they not? I'm not sure on that. I think they still have to have an injury in fact. They've got to be injured by some action. Injured by your? Oh, by the approval, right, by the illegal approval. That is correct. They would have been, yes, they would. But they didn't know about that injury, and that's what the Wind River case says. It's not until you learn about the injury, until that FOIA governing document has been imposed against them, that's when they knew about the injury. So no member of the plaintiff class knew in 2000 or 2003 about the decisions of the secretary, nor did any of them know about the decisions made by the tribe, however, whether or not it was correct or not, the original decision in 1997 and so on. They didn't know about any of that. Nobody knew anything. That's right. It didn't come out until 2011, and Mr. Freeman's in the courtroom. He was the one that signed on, and he's put his declaration in. He signed on that 1997 general counsel meeting where you've only got a minority present, and his declaration is in the record. He knew about it because he said there wasn't anybody, just a minority was there. Yeah, he's not a plaintiff to the case. We got him after the fact. Were there any plaintiffs in the case who complained about it at the time? No. Nobody knew about it. In fact, one of my clients was on the general counsel, just one out of the six people. They recused her, but she didn't know about it. So, I mean, the first time they knew about it was in 2011 when they started this whole thing against some other of the disenrollees. So they were using the words and the terms, and you have to look at the tribal members themselves are very unsophisticated. They're not educated people, and you use the terms, you know, articles of association, and you use the words constitution, and you just, you know, as interchangeable words, and they're thinking, you know, that's their governing document. They're not sophisticated people. So they wouldn't be able to challenge anything unless they knew what was going on, and they didn't know about that until 2011. They were sophisticated enough to know they'd been disenfranchised. They're sophisticated. Well, what they did to them was the federal government has applied this constitution that was never ratified by the band as a whole. I get your point. Okay. Thank you. Do you have any questions, Your Honor? No, thank you. Okay. Thank you both very much. The case just argued will be submitted.
judges: Reinhardt, Paez, M. Smith